# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

RYAN D. BRUNER,                    :
                                   :
          Plaintiff                :
                                   :      No. 4:11-CV-1359
     vs.                           :
                                   :      (Judge Nealon)
MICHAEL J. ASTRUE,                 :
COMMISSIONER OF SOCIAL             :                    **FILED**
SECURITY,                          :                    **SCRANTON**
                                   :
          Defendant                :                    NOV 0 5 2012

                    <u>MEMORANDUM</u>          PER _____

                                              DEPUTY CLERK

## Background

          The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
which denied Ryan D. Bruner's applications for social security
adult child disability insurance benefits and supplemental
security income benefits.

          The Social Security Act authorizes several classes of
disability benefits, including adult child disability insurance
benefits and supplemental security income benefits.

          To qualify for adult child disability insurance
benefits, a claimant must have been disabled before age 22 and
continue to be disabled and have or had a parent who qualifies or
qualified for Social Security benefits. 20 C.F.R. § 404.350.  In
other words the child is entitled to benefits based on the work
record of the parents. <u>Id.</u>

          Supplemental security income (SSI) is a federal income
supplement program funded by general tax revenues (not social

security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Bruner, who was born in the United States on December 12, 1985, graduated from high school in June, 2006, and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 27, 29, 55, 190, 195 and 233.[1] Although Bruner graduated from high school, he was home schooled his last three years of high school because he could not handle the classroom setting. Tr. 28, 39, 204, 233, 285, 340 and 342. He was 20 years old when he graduated from high school. Tr. 285, 340 and 342. Bruner has no work or earnings history. Tr. 47.

Bruner has lived with his grandparents since he was 9 years old. Tr. 27 and 247. "Function Reports" completed by Bruner and his grandfather reveal that Bruner is able to cope, including taking care of his personal needs, within the confines of his grandparents' home and yard, but outside that area he has panic attacks. Tr. 176-183, 187-194, 210-217, and 219-226. There were two "Function Reports" completed by Bruner's grandfather, the first on April 20, 2008, and the second on October 28, 2008. Tr. 176-183 and 210-217. In the "Function Report" dated April 20, 2008, Bruner's grandfather stated that Bruner "washes hands constantly." Tr. 182. In the "Function Report" dated October 28th Bruner's grandfather stated that Bruner rarely goes outside, he

1. References to "Tr.___" are to pages of the administrative record filed by the Defendant on September 21, 2011.

2

will not go out alone, he rarely goes shopping and he engages in

no social activities. Tr. 211 and 213-214. Bruner's grandmother

provided a written statement regarding Bruner's functioning which

states in toto as follows:

> Ryan has been living with us since he was 9 years old.
> He has been doctoring all these years and has been in
> Philhaven a short period of time. When he was in grade
> school he had people coming to my house weekly working
> with him. They had to take him to school and his dad sat
> in the classroom with him. One day he ran out of the
> class room and ran outside and down through the bushes
> (field). Scott and Judy from Millersburg the case
> workers worked with him for a long time. Ryan never
> liked to go on field trips or fun activities because he
> didn't like to be around people. In high school Ryan
> didn't want to go. In his [senior] year they had a
> tutor named John Paul come to the house. He really did
> good because he didn't have to be around people. He
> once had a job interview at a place where I worked but
> they waited 4-6 weeks to call him, and on the day he
> was to go he had a panic attack. Ryan doesn't even
> go to the store often. We (grandparents) do the
> shopping. If Ryan does go to the store he usually goes
> around mid night where their aren't a lot of people
> [there]. He also washes his hands constantly. Ryan has
> a lot of panic attacks and worries about things.

Tr. 247-248. The record substantiates the grandmother's statement

that Bruner received inpatient treatment at Philhaven, Mt. Gretna,

Pennsylvania, when he was in grade school. Tr. Tr. 375-387.[2]

---

2. Bruner received inpatient treatment at Philhaven when he was
10 years old from September 23 to October 21 and from December 26
to December 30, 1996. Tr. 375 and 381. He was diagnosed as
suffering from major depression and oppositional defiant
disorder. Id. Bruner also received outpatient treatment(wrap-
around services) at Philhaven from October 21, 1996, to September
19, 1997. Tr. 386.

On November 2 and 13, 2007, Bruner protectively[3] filed applications for SSI benefits and adult child disability insurance benefits, respectively, in which he claimed that he became disabled on October 8, 1996, because of mental disorders. Tr. 55-56 and 62-69. There is no indication that Bruner administratively appealed and requested a hearing with respect to the first set of applications. Bruner protectively filed a second set of applications for SSI benefits and adult child disability insurance benefits on August 29 and September 16, 2008, respectively, in which he claimed that he became disabled on December 12, 1996, because of mental disorders. Tr. 57-60 and 73-83. Bruner did not and presently does not claim that he is disabled as the result of a physical impairment. Bruner contends that he suffers from social anxiety disorder, obsessive compulsive disorder and panic disorder with agoraphobia.[4] Doc. 10, Plaintiff's Brief, p. 3.

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. According to the National Institute of Health's website

> Panic disorder with agoraphobia is an anxiety disorder in which there are repeated attacks of intense fear and anxiety, and a fear of being in places where escape might be difficult, or where help might not be available in case of a panic attack. Agoraphobia usually involves fear of crowds, bridges, or being outside alone.

A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National
(continued...)

Bruner claims he has a fear of leaving his house, being around people, or being exposed to germs. Tr. 37, 40, 295-310, 330-332, 340 and 390-397. Bruner also claims he engages in various compulsive ritualistic behaviors such as hand washing and taking long showers. Tr. 40. Bruner contends that his mental illness prevents him from engaging in full-time employment. Tr. 37.

Bruner's applications were denied initially by the Bureau of Disability Determination[5] on April 29, October 7 and December 18, 2008. Tr. 57-60, 62-69 and 73-83. On January 8, 2009, Bruner requested a hearing before an administrative law judge. Tr. 14. After about 18 months had elapsed, a hearing was held on June 8, 2010. Tr. 23-54. At that hearing the administrative law judge refused to reopen the first adult child disability application based on the second application but reopened the first SSI application and consolidated that application with the second SSI application.[6] Tr. 25. Bruner then amended his alleged disability

---

4.  (...continued)
Library of Medicince http://www.nlm.nih.gov/medlineplus/ency/article/000923.htm (Last accessed October 31, 2012).

5.  The Bureau of Disability Determination is an agency of the state which initially evaluates on behalf of the Social Security Administration applications for adult child disability benefits and supplemental security income benefits. Tr. 62 and 73.

6.  There is no explanation given by the administrative law judge for her refusal to reopen the adult child disability applications other than a statement at the administrative hearing that the earlier application was administratively final. Tr. 14-22 and
(continued...)

onset date of December 12, 1996, to November 13, 2007.[7] Id. On
July 16, 2010, the administrative law judge issued a decision
denying Bruner's applications for benefits. Tr. 14-22. On July 29,
2010, Bruner filed an appeal of the administrative law judge's
decision to the Appeals Council of the Social Security
Administration. Tr. 10. After about 11 months had passed, the
Appeals Council on June 6, 2011, concluded that there was no basis
upon which to grant Bruner's request for review. Tr. 1-4. Thus,
the administrative law judge's decision stood as the final
decision of the Commissioner.

On July 21, 2011, Bruner filed a complaint in this Court
requesting that the Court reverse the decision of the Commissioner
denying him adult child disability and SSI benefits. The
Commissioner filed an answer to the complaint and a copy of the
administrative record on September 21, 2011. Bruner filed his
brief on November 7, 2011, and the Commissioner filed his brief on

6.  (...continued)
25.

7.  The amended alleged disability onset date was still prior to
Bruner's 22nd birthday. Consequently, the amendment did not
negate/render moot or result in a de facto withdrawal of the
application for adult child disability insurance benefits.

December 9, 2011. The appeal[8] became ripe for disposition on December 19, 2011, when Bruner filed a reply brief.

For the reasons set forth below, the Court will vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

## Standard of Review

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter

---

8. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts

from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

An applicant for adult child disability insurance benefits or supplemental security income benefits will be considered disabled if the applicant is unable "to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work. For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the

national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

## Sequential Evaluation Process

In determining whether an applicant for adult child disability benefits and SSI benefits satisfies the definition of disability, the five-step sequential evaluation process outlined in 20 C.F.R. § 404.1520(a)(4) is used.

This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of impairments that meets or equals the

---

9. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

10. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404. 1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

10

requirements of a listed impairment,[11] (4) has the residual
functional capacity to return to his or her past work and (5) if
not, he or she can perform other work in the national economy. Id.
As part of step four the administrative law judge must determine
the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum
remaining ability to do sustained work activities in an ordinary
work setting on a regular and continuing basis. See Social
Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). The
residual functional capacity assessment must include a discussion
of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and
416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional
capacity' is defined as that which an individual is still able to
do despite the limitations caused by his or her impairment(s).").

**Medical Records**

Bruner received mental health treatment at Edgewater
Psychiatric Center, Millersburg, Pennsylvania, commencing in April
2004. Tr. 294-310, 329-332 and 390-394. Bruner at various times

---

11.  If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled.  If the claimant doe not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step.

12.  If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

was prescribed the drugs Zoloft, Buspar, Effexor, Lexapro, Xanax, Anafranil and Abilify.[13] Id. Mental status examinations/medication reviews conducted on June 1, August 31, October 12, November 8, and December 6, 2006, January 1 and 31, March 14, April 11, May 9, June 6, August 1, September 12, and November 21, 2007, January 2, April 23 and June 18, 2008, September 21 and December 30, 2009, and January 27 and March 7, 2010, were essentially unremarkable. Id. Bruner was appropriately groomed and dressed; he never reported suicidal or homicidal ideations, delusions, hallucinations, or paranoid thoughts; and he was cooperative and his speech and thoughts were organized. Id. These records do reveal, however, that Bruner at times exhibited a blunted or flat affect, an anxious mood and sleep disturbance. Id. It was also reported that Bruner avoided crowded places. Tr. 296. A medication/treatment progress note dated October 6, 2007, indicates that over the Memorial Day weekend in 2007, Bruner did travel to Ocean City, Maryland, and that "even though [he was] uncomfortable" he "was surprised that he could do it." Tr. 300. This progress note does not give any details regarding this trip such as whether or not he avoided crowded places. Id. These medication/treatment notes consistently identify Bruner's

13. All of these drugs are used to treat mental health conditions, including depression, anxiety, obsessive compulsive disorder and panic disorder.

diagnosis as obsessive compulsive disorder, social anxiety disorder and social phobia. Tr. 294-310, 329-332 and 390-394. From April 23, 2006, through April 7, 2010, Bruner's medication was reviewed by medical professionals at Edgewater Psychiatric Center 37 times. Tr. 294, 329 and 390.

On April 28, 2008, Mark Hite, Ed.D., a psychologist, reviewed Bruner's medical records on behalf of the Bureau of Disability Determination. Tr. 311-326. Dr. Hite found that Bruner suffered from social anxiety disorder and obsessive compulsive disorder. Tr. 326. Dr. Hite further found that Bruner was not significantly limited in 19 areas of mental functioning, including the ability to work in coordination with or proximity to others without being distracted by them, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and the ability to travel in unfamiliar places or use public transportation, and only moderately limited in one area, that being Bruner's ability to interact appropriately with the general public. Tr. 324-325. Dr. Hite concluded that Bruner was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments." Tr. 326. Dr. Hite did not address the issue of whether or not Bruner suffered from panic disorder with agoraphobia. Dr. Hite did not examine Bruner.

On December 5, 2008, Jonathan M. Gransee, Psy.D., a psychologist, examined Bruner on behalf of the Bureau of Disability Determination and prepared a report regarding that examination. Tr. 339-346. Dr. Gransee found that Bruner suffered from panic disorder with agoraphobia, social phobia and obsessive compulsive disorder and gave Bruner a Global Assessment of Functioning (GAF) score of 45.[14] Tr. 344-345. Dr. Gransee stated that Bruner's "ability to sustain his attention, concentration, and pace sufficiently well to perform satisfactorily in an eight-

14. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id.

hour work day/40 hour work week appears to be primarily impaired
by his high level of anxiety when he is in social situations and
the effect it has on his ability to concentrate." Tr. 345-346.
Dr. Gransee further found that Bruner had an extreme limitation
(defined as "no useful ability to function") in his ability to
respond appropriately to work pressures in a usual work setting.
Tr. 336-337. At the administrative hearing held in this case on
June 8, 2010, a vocational expert testified that such an extreme
limitation would eliminate the ability of a person to engage in
any competitive work. Tr. 53.

On December 15, 2008, Kenny Weeks, Ph.D., a
psychologist, reviewed Bruner's medical records on behalf of the
Bureau of Disability Determination. Tr. 347-364. Dr. Weeks found
that Bruner suffered from social anxiety disorder and obsessive
compulsive disorder. Tr. 349. Dr. Weeks further found that Bruner
was not significantly limited in 16 areas of mental functioning,
including the ability to maintain attention and concentration for
extended periods, the ability to interact appropriately with the
general public and the ability to respond appropriately to changes
in the work setting, and only moderately limited in three areas,
those being Bruner's ability to work in coordination with or
proximity to others without being distracted by them, to get along
with coworkers or peers without distracting them or exhibiting

behavioral extremes, and to travel in unfamiliar places or use public transportation. Tr. 347-348. Dr. Weeks concluded that Bruner was "able to meet the basic mental demands of competitive work on a sustained basis." Tr. 326. Dr. Weeks did not address the issue of whether or not Bruner suffered from panic disorder with agoraphobia. Dr. Weeks did not examine Bruner.

On July 13, 2009, Edward H. Coronado, M.D., a psychiatrist who treated Bruner at Edgewater Psychiatric Center, completed a psychiatric evaluation of Bruner. Tr. 395-397. After clinically interviewing Bruner, Dr. Coronado concluded that Bruner suffered from social phobia, panic disorder with agoraphobia, and obsessive compulsive disorder. Tr. 397. Dr. Coronado gave Bruner a GAF score of 40, representing some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. Dr. Coronado further noted that Bruner had not been on medications for at least six months and started Bruner on the drugs Anafranil and Xanax. Tr. 395 and 397.

On March 1, 2010, George A. Wiswesser, M.D., one of Bruner's treating psychiatrists, completed on behalf of Bruner a document entitled "Medical Statement Regarding the Nature and Severity of Mental Impairment." Tr. 388-389. Dr. Wiswesser found that Bruner had marked limitations (defined as "unable to function

16

independently, appropriately, effectively, and on sustained basis") in the following three areas of mental functioning: ability to get along with co-workers and peers, maintain socially appropriate behavior, and set realistic goals or make plans independently of others. Tr. 388. Dr. Wiswesser also found that Bruner had extreme limitations (defined as "no useful ability") in the following five areas of mental functioning: ability to work with or near others without being distracted by them, complete a normal workday or workweek, interact appropriately with the public, and respond appropriately to changes in the work setting. Id. At the administrative hearing held in this case, a vocational expert testified that such limitations would eliminate the ability of a person to engage in any competitive work. Tr. 53.

**Discussion**

The administrative law judge, at step one of the sequential evaluation process, found that Bruner has not engaged in substantial gainful activity since November 13, 2007,[15] the prior application's date and the amended alleged disability onset date. Tr. 16.

At step two, the administrative law judge found that Bruner suffers from the following severe impairments:

---

15. As noted earlier in this memorandum, Bruner has no past relevant work and has never engaged in substantial gainful activity.

"anxiety/panic disorder with agoraphobia and obsessive compulsive disorder." Id.

At step three, the administrative law judge found that Bruner does not have an impairment or combination of impairments which meet or medically equal one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. Id. In so finding, the administrative law judge did not refer to any medical opinion evidence.

At step four, the administrative law judge found Bruner had no prior relevant work experience but had the residual functional capacity to perform simple, unskilled work at all exertional levels which did not require "climbing ropes, ladders and scaffolding; working in high exposed places, around fast moving machinery on the ground, around or with sharp objects, or work around or with toxic or caustic chemicals" and "avoid[ed] working directly with the public and work[] on a moving assembly line or similar production-rate work." Tr. 17. In so finding, the administrative law judge rejected the opinions of Bruner's treating psychiatrists, Dr. Wiswesser and Dr. Coronado, and the opinion of Dr. Gransee, who examined Bruner on behalf of the Bureau of Disability Determination. In rejecting the opinions of Dr. Wiswesser, Dr. Coronado and Dr. Gransee, the administrative law judge did not refer to any contrary medical opinion.

18

During the hearing on June 8, 2010, the administrative law judge took testimony from a vocational expert to determine whether or not jobs exist in the economy for an individual of Bruner's age, education, lack of work background, and the above described residual functional capacity. The vocational expert testified that Bruner could perform the unskilled jobs of sexton, hand packager and cafeteria attendant, and that there were a significant numbers of such jobs in the local, regional and national economies. Tr. 49-51.

At step five, the administrative law judge concluded that Bruner was not disabled because he could perform the jobs identified by the vocational expert. Tr. 21.

Bruner makes three arguments in support of his request that the decision of the administrative law judge be reversed and that the case be remanded for an award of benefits, or alternatively, for further administrative proceedings. Bruner argues that (1) the administrative law judge did not determine properly that Bruner retained the ability to work; (2) the administrative law judge's residual functional capacity determination for Bruner failed to include credibly established limitations; and (3) the administrative law judge did not evaluate properly relevant opinions that supported Bruner's disability claim. The Court finds substantial merit in Bruner's arguments

which in essence center and revolve around the ALJ's rejecting of the opinions of the treating physicians, Dr. Wiswesser and Dr. Coronado, and the consultative examiner, Dr. Gransee.

The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the

20

temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990).

In this case, in rejecting the opinions of Dr. Wiswesser and Dr. Coronado, the treating physicians, and Dr. Gransee, the consultative examiner, the ALJ did not point to any contrary medical evidence. The ALJ engaged in her own lay analysis of the medical records (primarily focusing on the relatively unremarkable mental status examinations) and Bruner's purported daily activities. This was clear error. Although Bruner generally had unremarkable mental status examination, both Dr. Wiswesser and Dr. Coronado based on their clinical interviews with Bruner determined that he had work-preclusive mental limitations. The work-preclusive mental limitations were primarily attributable to Bruner's panic disorder with agoraphobia. The fact that Bruner had unremarkable mental status findings (e.g., no homicidal or suicidal ideations, delusions or hallucinations) does not call into question the clinical assessments of Dr. Wiswesser and Dr. Coronado that Bruner suffered from panic disorder with agoraphobia and had marked and extreme limitations which precluded Bruner from engaging in full-time competitive work on a sustained basis.

In an effort to defend the decision of the ALJ, the Commissioner points to the opinions of the two non-examining state

21

agency reviewing consultants, Dr. Hite and Dr. Weeks. However, the ALJ did not rely on those opinions. Furthermore, the administrative law judge found that Bruner suffered from the severe impairment of panic disorder with agoraphobia and neither of those state agency consultants found that Bruner suffered from that condition. Both Dr. Wiswesser and Dr. Coronado as well as Dr. Gransee found that Bruner suffered from panic disorder with agoraphobia. Dr. Hite and Dr. Weeks did not address that condition. Consequently, the assessments of Dr. Hite and Dr. Weeks do not amount to substantial evidence that Bruner could engage in the work identified by the vocational expert.

The Court's review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be vacated and the case will be remanded to the Commissioner for further proceedings.

An appropriate order follows.


_____
**United States District Judge**

Dated: November 5, 2012


22